In re:
RIO VALLEY MOTORS COMPANY, LLC
    Debtor.                                                                            No. 11-06-11866 SS

**MEMORANDUM OPINION AND ORDER DENYING DEBTOR'S MOTION TO
RECONSIDER, VACATE, AMEND AND MODIFY ORDER OF DECEMBER 6, 2006
WHICH DENIED FURTHER USE OF CASH COLLATERAL**

        This matter is before the Court on Debtors' Motion to Reconsider, Vacate, Amend and Modify Order of December 6, 2006 Which Denied Further Use of Cash Collateral (with exhibits) and the supporting affidavit from Debtor's president Rick Trujillo (docs 75 and 77 respectively), Valley National Bank's response in support of the Motion for Reconsideration (doc 76), and the objection thereto ("Objection") filed by Ford Motor Credit Company ("FMCC") (doc 79). On December 6, 2006, the Court had entered its Memorandum Opinion and Order Denying Further Use of Cash Collateral (doc 64). For the reasons set forth below, the Court finds that the Motion for Reconsideration should be denied. This is a core proceeding. 28 U.S.C. § 157(b)(2)(L).

**Analysis**

<u>Legal Standard</u>

    The Motion to Reconsider does not recite whether it is brought under Rule 9023 F.R.B.P., incorporating Rule 59 F.R.Civ.P., or Rule 9024 F.R.B.P., incorporating Rule 60(b)

F.R.Civ.P. However, a "motion for reconsideration"[1] filed within ten days of the challenged ruling is considered a Rule 59 motion. Adams v. Reliance Standard Life Ins. Co., 225 F.3d 1179, 1186 n.5 (10th Cir. 2000), citing Hatfield v. Bd. of County Comm'rs for Converse County, 52 F.3d 858, 861 (10th Cir. 1995). The Court will therefore review the Motion for Reconsideration under Rule 59.

>Rule 59(a) provides in part as follows:
>
>Grounds: A new trial may be granted to all or any of the parties and on all or part of the issues...(2) in an action tried without a jury, for any of the reasons for which rehearings have heretofore been granted in suits in equity in the courts of the United States.

A motion for reconsideration should be granted only to correct manifest errors of fact or law or to present newly discovered evidence. Id., citing Phelps v. Hamilton, 122 F.3d 1309, 1324 (10th Cir. 1997).

>A motion for reconsideration is the opportunity for the court to (1) correct manifest errors of law or fact;

---

[1] Neither the Federal Rules of Civil Procedure nor the Bankruptcy Rules recognize a motion for reconsideration. Dimeff v. Good (In re Good), 281 B.R. 689, 699 (10th Cir. BAP 2002). Although, when filed
>[m]otions for "reconsideration" of a judgment should be treated as motions to alter or amend judgment under Rule 59(e) F.R.C.P., made applicable to bankruptcy by Rule 9023 Fed.R.Bankr.P. Under those rules, a party seeking to alter or vacate a judgment has 10 days from entry of the judgment to file a motion for such relief. Such motions will only be granted if there has been a mistake of law or fact or there is newly discovered evidence not previously available.

In re Bushman, 311 B.R. 91, 95 n.5 (Bankr. D. Utah 2004).

> (2) review newly discovered evidence; or (3) review a
> prior decision in light of a recent change in the law.
> Appropriate circumstances for a motion to reconsider
> are where the court has obviously misapprehended a
> party's position on the facts or the law, or the court
> has mistakenly decided issues outside of those the
> parties presented for determination. A party cannot
> invoke Rule 59(e) to raise arguments or present
> evidence that should have been raised in the first
> instance, or to rehash arguments previously considered
> and rejected by the court. A party's failure to
> present its strongest case in the first instance does
> not entitle it to a second chance in the form of a
> motion to reconsider.

Sunflower Racing, Inc. V. Mid-Continent Racing & Gaming Co. I (In re Sunflower Racing, Inc.), 223 B.R. 222, 223 (D. Kan. 1998). (Internal citations omitted.) Because motions for reconsideration are not intended to function as second bites of the apple, they are frequently denied.

> The Rule 59(e) motion may not be used to relitigate old
> matter, or to raise arguments or present evidence that
> could have been raised prior to the entry of judgment.
> Also, amendment of the judgment will be denied if it
> would serve no useful purpose. In practice, because of
> the narrow purposes for which they are intended, Rule
> 59(e) motions typically are denied....

11 Wright, Miller and Kane, Fed. Prac. & Proc. Civ.2d § 2810.1. (Footnotes omitted.)

<u>Collateral Values and Debt</u>

Frequently the heart of a cash collateral decision is whether the debtor's use of cash collateral will cause the creditor's interest in the collateral to deteriorate; that is, whether the creditor's position in the collateral to be used is being adequately protected. See A. Resnick and H. Sommer, 3

Page 3 of 15

Case 06-11866-s11    Doc 82    Filed 12/21/06    Entered 12/21/06 15:29:24 Page 3 of 15

Collier on Bankruptcy ¶363.03[4] (15th Ed. Rev. 2006)[2]. That was and is the critical factor in this case, as was abundantly clear from the collateral value and debt calculations that went into the first order authorizing the use of cash collateral. Docs 46 (amended minutes of decision from November 3 hearing) and 61 (interim order authorizing use of cash collateral).

In consequence of the foregoing, the Debtor's overriding priority in the November 30 hearing should have been to clearly demonstrate, by a preponderance of the evidence, what the Debtor's financial position and the creditor's collateral positions were as of November 29 or thereabouts.[3] That presentation generally speaking would have had to include a clear and detailed accounting of the cash and cash equivalents (including the contracts in transit) in the possession of the Debtor, the inventory of vehicles, parts and supplies and the values thereof, the tracing of cash out of the sales of inventory and into the purchase of more inventory, what cash or other

---

[2] "In the absence of the creditor's consent, the trustee may use cash collateral only with the approval of the court which will normally require adequate protection for the holder of the adverse interest." (Footnotes omitted.)

[3] "In any hearing under this section ... the [debtor in possession] has the burden of proof on the issue of adequate protection;...." §363(p) (relettered but not otherwise amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 37 (2005)). References to the Code in this memorandum opinion and order are to the Bankruptcy Code as amended by BAPCPA unless otherwise stated.

assets had been expended in the month of November, and a side-by-side comparison of all those numbers for late November compared with the analogous numbers for early November or mid-October, when the petition was filed.  This the Debtor simply did not do.

What the Debtor focused on instead was whether it turned a profit for the month.  Obviously there is nothing wrong per se with the Debtor presenting that information to the Court and the creditors.  Even more obviously, turning a profit is a good thing for a chapter 11 debtor.  But this was a hearing that was supposed to focus on the status of the creditor's collateral.  That issue was far more of a priority than the monthly profit.  The creditor holding a secured claim may or may not care about the success of the reorganization effort; the creditor clearly cares about collecting its debt from the collateral (including the replacement collateral), and will not want that collateral diminished or put at risk of being diminished.  And it is this concern that the Court is obligated to take into consideration in deciding adequate protection issues.

The exhibits that Debtor submitted with the Motion to Reconsider provide a clearer picture of the Debtor's finances and assets (albeit as of December 8) than what it presented on November 30, and in fact constitute a good start on providing the side-by-side comparison.  <u>See</u> Exhibit D attached to Motion to Reconsider.  The problem of course is that by not presenting this

information adequately during the November 30 hearing, the Debtor deprived the creditors of the ability to scrutinize the information and cross examine Mr. Trujillo about it. That is one of the vices that the prohibition on non-newly discovered evidence is supposed to prevent. The fact that the Debtor has been able to produce this information so quickly suggests that had the Debtor could have produced this information, in as organized a fashion as it appears in the exhibits to this motion, at the November 30 hearing. And that is a major factor weighing against granting the Motion to Reconsider.

Even were the Court to accept the Debtor's new figures, it would not make a difference, since those numbers, as FMCC has pointed out, show even less collateral value than the Court had calculated based on the evidence presented at the November 30 hearing. Attached to this memorandum opinion is an annotated chart showing the collateral values based on the record, including the exhibits attached to the Motion to Reconsider. What it shows is that the Court's memorandum opinion denying further use of cash collateral (doc 64) calculated a decrease in the collateral value of at least $184,000, and that the Motion to Reconsider shows a decrease of at least $227,000.[4]

---

[4] The Court uses the phrase "at least" to highlight that the first estimate of value (from the November 3 hearing) discounted the values offered by the Debtor to values that the Debtor or a trustee might be more likely to obtain in a sale of the business. The second and third columns of figures, which were drawn largely

FMCC's debt is approximately $1,985,000, taking into account the delivery to FMCC of the $315,000.[5] Valley National Bank's claim is about $260,000.[6] If the estate does not realize the value of the franchise for whatever reason, including because the Debtor "goes dark" before a sale can be accomplished, the value of FMCC's collateral may exceed its debt by as little as ($2,052,000 - $1,985,000 =) $67,000 or less. That small a margin

---

from the Debtors proffers, are largely not discounted.

[5] In its Objection, FMCC claims an additional charge of $60,000 for "delinquent Wholesale charges". Objection at 8 n.3. Whether FMCC is entitled to that extra payment is of course subject to the terms of the contract and security documents and to the availability of collateral value. See <u>United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.</u>, 484 U.S. 365 (1988). Should the estate lose the value of the franchise, for example, FMCC's claim may well turn out to be undersecured. That loss of the franchise value would not result from the Debtor's postpetition use of cash collateral, and so FMCC would not, on account of that loss, have an administrative claim pursuant to §507(b) or the interim order authorizing the use of cash collateral (doc 61). The Court issues this reminder of the obvious in part because of the call the Court received from Debtor's counsel late Tuesday afternoon, December 20, inquiring when this decision would be issued. (The Court instructed its staff to tell counsel's office that the Court has been working on this decision for the last two days; in fact, it had been several days.) Part of the message from counsel was that the Debtor had two offers to purchase the business. (Presumably the Debtor had promptly communicated those developments to FMCC.) Whether either of those offers comes to fruition, and what value the estate receives, may depend on whether the Debtor and FMCC are able to reach an accommodation on the Debtor's operating expenses.

[6] This figure treats as a wash the amount of the Bank's claim secured by the trailers with the value of the trailers. The Court's use of this figure is not intended to be an adjudication of which creditor has a priority in the trailer collateral or what its value is.

on that large a debt does not constitute "relief ... as will result in the realization by such entity of the indubitable equivalent of [FMCC's] interest in the property." §361(3); see Metropolitan Life Ins. Co. v. Murel Holding Corporation (In re Murel Holding Corporation), 75 F.2d 941, 942 (2nd Cir. 1935) (defining "adequate protection" as "a substitute of the most indubitable equivalence"). In consequence, the Debtor's Motion to Reconsider does not present a basis for the Court to find that it committed a clear factual or legal mistake that needs to be redressed.

Other Issues

The Motion to Reconsider, including Mr. Trujillo's affidavit, makes a number of assertions about or challenges to the Court's order denying the further use of cash collateral which deserve a response.

Paragraph 12 of the Motion to Reconsider states that the Court's order permitting the use of cash collateral was not "finalized" until November 11, when the minutes were finalized and filed (doc 45). In fact, the order was not really "finalized" until the written order was prepared by Valley National Bank's counsel (acting proactively) and entered by the Court. However, the Debtor knew what it could do and what it had to do by the close of the November 8 hearing at which the Court delivered its oral ruling (including ruling on Mr. Trujillo's

supplemental request to be able to pay off trade-in liens that had not been specified in the Debtor's original request).

Paragraph 14 recites that "time did not permit" the updating of the vehicle inventory lists. From what the Court has observed, it appears that Debtor's counsel either did not allocate sufficient time to work with Mr. Trujillo to adequately prepare for the November 30 hearing, or did not provide adequate counsel to the Debtor about what information was needed and how it should be organized for that hearing. At the November 30 hearing it was clear that there were errors in the exhibits which could have been avoided had Mr. Trujillo and his staff had the instructions or attention from counsel to begin assembling the data earlier in the month and then keep it updated. The Court is, and was, aware that the Thanksgiving holiday took place just one week before the November 30 hearing, and that assembling the requisite information on an ongoing basis in order to avoid a "crunch" at the end was a burden for the Debtor. Indeed the Court expressed some sympathy for the number and size of the tasks ahead for Mr. Trujillo at the November 8 hearing. Nevertheless, those tasks were critical for the Debtor to perform; if Mr. Trujillo had been counseled to fully appreciate their importance, he would have seen to it that they were accomplished well and timely.

Concerning paragraphs 15 and 16, it is true that the best

scheduling the Court could come up with required the Debtor to testify on November 30 what its numbers were, rather than two or three or more days later, when presumably it would have been able to submit month end figures with more finality. But the Debtor's problem was not the lack of absolute finality for the November numbers. In fact, the Court and the creditors effectively accepted and used the Debtor's estimates for the final day or two of November.

The Debtor's complaint in this regard perhaps raises the question of how much control over its record-keeping the Debtor has. Nevertheless the Court has assumed that the Debtor can, on any given day, provide a reasonably accurate snapshot of what its inventory, finances, cash flow, etc. are. Compare In re Glasstream Boats, Inc., 110 B.R. 611, 614 (Bankr. M.D. Ga. 1990) (use of cash collateral denied to debtor which could produce financial statements only monthly).

It is true, as stated in paragraph 16, that the Debtor received the Court's order denying further use of cash collateral on December 6, which of course was six days after the November 30 hearing. The Court would have preferred to have the decision out much sooner. However, as is apparent from the decision, the disheveled presentation of the Debtor's case required the Court to spend significant time sorting out the facts upon which to base its decision.

The foregoing comments should make clear that the charge leveled in paragraph 27, that the Court is critical of Mr. Trujillo, is incorrect. Mr. Trujillo has worked diligently to make this chapter 11 reorganization work. The problem appears to lie with Debtor's counsel, who has not spent enough time guiding the Debtor through the very tricky maze that constitutes the opening weeks of a chapter 11 case and who has lacked the flexibility to deal with a judge that has not met his expectations. The lack of flexibility is illustrated by counsel not advising Mr. Trujillo to immediately forward the $315,000 to FMCC as explicitly ordered by the Court[7], and even more important by counsel not advising Mr. Trujillo to more urgently select a broker and begin soliciting a sale. The Debtor addressed that critical issue most cursorily in the November 30 hearing; its explanation now in paragraph M of Mr. Trujillo's affidavit is still puzzling in light of the fact that by November 3 the Debtor had winnowed the list down to two at the most.[8] In fact, at the November 3 hearing the Debtor appeared to commit to a sale as soon as possible, albeit with the qualifier that such a sale could not be accomplished in sixty days.

---

[7] See In re Glasstream Boats, Inc., 110 B.R. at 612 (Debtor's failure to pay over proceeds of sales as ordered by court).

[8] This finding is based on Mr. Trujillo's testimony during his cross examination by Valley National Bank's counsel on November 3.

Case 06-11866-s11   Doc 82   Filed 12/21/06   Entered 12/21/06 15:29:24 Page 11 of 15

Mr. Trujillo also points out in paragraph E of his affidavit that the Court obviously does not understand how contracts in transit work, and how a vehicle sold for $27,000 with a trade in of $22,000 can result in a contract for $35,000. Mr. Trujillo is correct; the Court did not understand those transactions at the time it was making its decision not to allow the further use of cash collateral. The Court also acknowledges that Mr. Trujillo has eighteen years of experience in the car sales business, and is undoubtedly an expert. And it is perhaps therein that the problem lies. For it is the Debtor's burden to prove up its case for cash collateral, part of that burden is making clear, on the record, all the facts the Court needs to know to make that decision, and apparently Mr. Trujillo and Debtor's counsel assumed that the Court was familiar with many of the esoteric details of the auto sales business such as how these contracts worked. It is now clear that those assumptions were incorrect. But at least the Debtor is now on notice to lay an adequate factual foundation in any future hearings. In the meantime, as it turns out, it did not make a difference that the Court did not have that particular knowledge; accepting the Debtor's numbers from its Motion to Reconsider (which presumably takes into account all the relevant facts) results in a collateral value

even less than the Court had calculated on its own.[9]

**Conclusion and Order**

For the foregoing reasons, the Court finds that there are no grounds for changing the decision refusing to allow the further use of cash collateral. The Court accepts that this decision may have disastrous consequences for the Debtor, for the Debtor's constituent member, for most if not all of the creditors, and especially for the employees. Unfortunately, the Court is compelled to this conclusion by the facts presented by the Debtor and the law. It was a decision that the Court thought long and hard about, as it has this decision to deny the Motion to Reconsider.

Unquestionably the Debtor desperately needs the use of the cash collateral not only to preserve its chances (whatever they may be) of realizing the full value of its business, but also to pay its expenses, most prominently the back and future wages of its employees. The Court in its previous decision characterized the denial of cash collateral as a "disaster" for the business and particularly for the employees. That continues to be the case. However, the Bankruptcy Code demands that protection of the creditor's interest take precedence over the Debtor's needs,

---

[9] This conclusion applies as well to the criticism in paragraph K of this Court's hesitation about the contracts in transit since the Court could not tell, from the evidence presented at the hearing, what the source ("provenance") of the contracts were.

no matter how desperate.  <u>In re Goode</u>, 235 B.R. 584, 590 (Bankr.
E.D. Tx. 1999)[10].

IT IS THEREFORE ORDERED that the Debtors' Motion to
Reconsider, Vacate, Amend and Modify Order of December 6, 2006
Which Denied Further Use of Cash Collateral (doc 75) is denied.

                          /s/ James S. Starzynski
                          James S. Starzynski
                          United States Bankruptcy Judge

COPY TO:

| | |
|---|---|
| Walter L Reardon, Jr<br>3733 Eubank Blvd NE<br>Albuquerque, NM 87111-3536 | Donald Cram<br>Severson & Werson<br>One Embarcadero Ctr<br>San Francisco, CA 94111 |
| William L Needler<br>555 Skokie Blvd #500<br>Northbrook, IL 60062 | Duane Geck<br>Severson & Werson<br>One Embarcadero Ctr<br>San Francisco, CA 94111 |
| Alice Nystel Page<br>PO Box 608<br>Albuquerque, NM 87103-0608 | James Jurgens<br>100 La Salle Cir Ste A<br>Santa Fe, NM 87505-6976 |

---

[10] "Yet it appears that this Debtor believes that the authorization for use of a creditor's cash collateral can be given solely upon a demonstration that the debtor's need for the use of the cash collateral may be more drastic than that of the creditor and that, absent such authorization, the Debtor may be unable to attempt the confirmation of a chapter 13 plan.  While the Court understands that the ramifications of failing to get such authorization can be devastating to a debtor's case, that fact alone simply cannot suffice as the sole means by which to justify the use of a creditor's cash collateral, when the Debtor cannot offer any other means by which to protect that creditor's interest in a meaningful way."  Citations omitted.

| ASSET[11] | AS OF NOV. 3[12] | ORDER-DOC 64 | M/RECONSIDER-DOC 75[13] |
|---|---|---|---|
| Cash on Hand | 219[14] | 161[15] | 264[16] |
| Contracts or wires in transit | 000[17] | 118 | 000 |
| Vehicle inventory | 1,800 | 1,656 | 1,499 |
| Parts and supplies | 90 | 45 | 132 |
| Machinery and fixtures | 40 | 40 | 40 |
| Receivables | 130 | 75 | 117 |
| Franchise | 600 | 600 | 600 |
| Totals | 2,879[18] | 2,695 | 2,652 |
| Decrease in collateral value | | (184) | (227) |

---

[11] All entries are in thousands of dollars; some figures have been rounded.

[12] Based on the oral findings delivered by the Court on November 8, 2006 and appearing in the minutes of that hearing (doc 46).

[13] Other than the machinery and fixtures figure, these numbers are taken at face value from the Debtor's exhibits and not "discounted", as are the Nov. 3 column figures. As a result, a more accurate estimate of the real value of the Motion to Reconsider figures could be even lower.

[14] Net of the $315,000 which the Court ordered to be paid to FMCC. The gross figure would be $534,000; this is the figure that appears in the minutes.

[15] Net of the $315,000 which the Court ordered to be paid to FMCC. The gross figure would be $476,000, which appears in the order.

[16] This figure is net of the $315,000 which the Court ordered to be paid to FMCC.

[17] Debtor's Exhibit D admitted at the first cash collateral evidentiary hearing incorporated the wires in transit figure into the cash at hand. The Court found in the Memorandum Opinion and Order Denying Further Use of Cash Collateral (doc 64) that these funds could effectively be treated as cash.

[18] These figures are "formatted" somewhat differently than in the Nov. 8 minutes, where the Court listed the cash in hand separately from the rest of the collateral.